## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ERNEST BILLIZONE, SR., ET AL.**                    **CIVIL ACTION**

**VERSUS**                                           **NO. 14-2594**

**JEFFERSON PARISH**                                 **SECTION: "C"(1)**
**CORRECTIONAL CENTER, ET AL.**

### REPORT AND RECOMMENDATION

Plaintiff, Ernest Billizone, Sr., a state prisoner, filed this *pro se* and *in forma pauperis* civil action pursuant to 42 U.S.C. § 1983.[1]  Although he listed forty-one of his fellow inmates as co-plaintiffs, they were not in fact parties to this lawsuit because they neither signed the complaint nor otherwise indicated a willingness to join this lawsuit and be responsible for the filing fee.  Recently, however, one of those inmates, Michael Walker, did in fact submit a signed complaint (which

---

[1]    In pertinent part, that statute provides:

>    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

incorporated by reference Billizone's original complaint),[2] as well as an application to proceed as a pauper[3] which has been granted.[4]   Accordingly, the Court now considers Walker to be a co-plaintiff.[5]

Plaintiffs have named the following defendants:  the Jefferson Parish Correctional Center; the Parish of Jefferson; Commissary Supervisor Mary Charles; R. Cyprian; Chief Administrator Sue Ellen Monfra; Sheriff Newell Normand; Keefe Commissary Network Sales; "John Doe Policy Maker"; "All S.I.U. Disciplinary Hearing Officers"; and Lt. Steven Abadie.   In this lawsuit, plaintiffs challenge various conditions of their confinement at the Jefferson Parish Correctional Center ("J.P.C.C.").[6]

Federal law mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  28 U.S.C. § 1915A(a).[7]   Regarding such lawsuits, federal law further requires:

---

[2]     Rec. Doc. 9.

[3]     Rec. Doc. 10.

[4]     Rec. Doc. 11.

[5]     It must also be noted that although there was a motion to have this matter certified as a class action, that motion was denied.  Rec. Docs. 5 and 7.

[6]     The complaint also originally included a religious discrimination claim asserted against Chaplain Kathy Radke.  Rec. Doc. 3-1, pp. 11-12.  However, that claim was subsequently voluntarily dismissed.  Rec. Doc. 8.

[7]     "[T]he term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  28 U.S.C. § 1915A(c).

On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –

> (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
> (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

Additionally, with respect to actions filed *in forma pauperis*, such as the instant lawsuit, federal law similarly provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action or appeal –
>
> (i) is frivolous or malicious;
> (ii) fails to state a claim on which relief may be granted; or
> (iii) seeks monetary damages against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

A complaint is frivolous "if it lacks an arguable basis in law or fact." Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). In making a determination as to whether a claim is frivolous, the Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994).

A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." _In re_ Katrina Canal Breaches

Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation marks omitted).  The

United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

Although broadly construing the plaintiffs' complaint,[8] the Court nevertheless finds that, for

the following reasons, the complaint should be dismissed as frivolous and/or for failing to state a

claim on which relief may be granted.

### I.  Failure to Provide Transportation to Parole Revocation Hearings

Plaintiffs' first claim is that officers at the J.P.C.C. sometimes fail to provide transportation

to scheduled parole revocation hearings for inmates.  As a result, the hearings are missed, and the

inmates have to wait an additional month until another hearing is held.  Although plaintiffs are

obviously concerned about this purported failure on the part of prison officials, they do not allege

that they have been personally affected by it; instead, they cite an incident in which inmate Dwayne

Moses was not taken to such a hearing.  However, plaintiffs do not have standing to bring a claim

on behalf of another inmate.  See, e.g., Gregory v. McKennon, 430 Fed. App'x 306, 310 (5th Cir.

---

[8]    The court must liberally construe a _pro se_ civil rights complaint.  See Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994).

2011); Reeves v. Collins, No. 94-10182, 1994 WL 559050, at *2 (5th Cir. Sept. 23, 1994); Morrison v. Gusman, Civ. Action No. 10-217, 2010 WL 724173, at *4 (E.D. La. Feb. 22, 2010); Diggs v. Nelson Coleman Corr. Ctr., Civ. Action No. 10-97, 2010 WL 1038229, at *7 (E.D. La. Feb. 17, 2010), adopted, 2010 WL 1038230 (E.D. La. Mar. 17, 2010); Scheanette v. Riggins, No. Civ. A. 9:05CV34, 2006 WL 722212, at *9 (E.D. Tex. Mar. 15, 2006).   Accordingly, this claim need not be further considered in this action.[9]

## II.  Mail Service

Plaintiffs next complain that prison officials fail to properly process mail at the facility. Specifically, Billizone alleges that his outgoing mail, including legal mail, has been returned to him by defendant Charles because no postage was affixed and, according to Charles, plaintiff was not entitled to use the indigent mail services.  Billizone argues that he does in fact qualify as an indigent inmate.  He further complains that the indigent mail program is inadequate, in that a prisoner is allowed only five pieces of indigent mail per week.

With respect to *non-legal* mail, this claim clearly fails because an inmate simply "does not have a freestanding constitutional right to free postage."  Walker v. Davis, 533 Fed. App'x 471 (5th Cir. 2013), cert. denied, 134 S. Ct. 643 (2013); accord Lee v. Perry, No. 93-4291, 1993 WL 185752 (5th Cir. May 19, 1993).

That general rule, however, does *not* apply to *legal* mail.  Because inmates have a recognized right of access to the courts, indigent inmates must be provided with postage for the purpose of

---

[9]    In any event, the Court notes that Moses had previously filed his own separate lawsuit concerning that incident.  Moses v. Jefferson Parish, Civ. Action No. 14-2379 "A"(1) (E.D. La.). The claim is being considered in that action.

sending legal mail.  As the Supreme Court noted in Bounds v. Smith, 430 U.S. 817, 824-25 (1977): "[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts.  It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, *and with stamps to mail them*."  Id. at 824-25 (emphasis added).  Reflecting on the foregoing language, the United States Second Circuit Court of Appeals has nevertheless noted that the right has limitations:

> In its opinion in Bounds, the Court also stated that "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents ... and with stamps to mail them."  430 U.S. at 824-25, 97 S. Ct. at 1496. Although this statement itself was unqualified, we do not read it as requiring that the indigent inmate be provided unlimited free postage, but only that he not be denied "a reasonably adequate" (id. at 825, 97 S.Ct. at 1496) amount of postage to present his claimed violations of fundamental constitutional rights to the courts.  Accord Twyman v. Crisp, 584 F.2d 352, 359 (10th Cir. 1978) (per curiam); Guajardo v. Estelle, 580 F.2d 748, 762-63 (5th Cir. 1978); Bach v. Coughlin, 508 F.2d [303,] 307 [7th Cir. 1974)].  Thus, a state is entitled to adopt reasonable postage regulations in light of, for example, prison budgetary considerations.  Id. at 307-08; cf. Bounds v. Smith, 430 U.S. at 825, 97 S.Ct. at 1496 (Court's determination that adequate library facilities must be provided was "not to say that economic factors may not be considered ... in choosing the methods used to provide meaningful access").

Chandler v. Coughlin, 763 F.2d 110, 114 (2nd Cir. 1985); accord Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996) ("Inmates do not have a right ... to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.").

Therefore, it is clear that reasonable limits on the amount of free legal mail an inmate may send are permissible, *so long as* they do not infringe on an inmate's right to meaningful access to the courts.  Here, Billizone attempts to challenge the reasonableness of the limitations in place at the

J.P.C.C., arguing that they are too niggardly, at least *as applied to him,* in light of the fact that he has "6 or 7 different matters in court, from state district courts to federal."[10]  However, when an inmate challenges the reasonableness of such limitations, he "must provide some basis for his allegation that the delay or failure in delivering his legal mail deprived him of meaningful access to the courts." White v. White, 886 F.2d 721, 723 (4th Cir. 1989).  Therefore, "to state a claim based on delay or interference with the mail, a plaintiff must show actual injury.  In this context, an inmate shows an actual injury by establishing that his position as a litigant was prejudiced due to the disputed acts." Weatherspoon v. Ferguson, 302 Fed. App'x 231 (5th Cir. 2008) (citation and quotation marks omitted).   In order to demonstrate the prejudice necessary to support such a claim, "a prisoner must show that his ability to pursue a nonfrivolous legal claim was hindered by the actions of the defendants," such as by providing "concrete evidence to demonstrate that defendants' actions caused him prejudice by hindering the progression of his current cases or the pursuit of future litigation." Lockamy v. Dunbar, 399 Fed. App'x 953, 955 (5th Cir. 2010).  Billizone makes no allegation of actual prejudice, and, therefore, no cognizable "access to courts" claim has been stated.  See, e.g., Diaz v. Green, 242 Fed. App'x 204, 205 (5th Cir. 2007).

Accordingly, for all of these reasons, this claim should be dismissed.

### III.  Inadequate Measures to Control Inmate Behavior

Plaintiffs also complain that prison officials fail to take adequate measures to prevent inmates from throwing urine and feces on staff and other inmates.  They suggest:

---

[10]   Rec. Doc. 3-1, p. 8.

> There are simple ways to put a stop to these stupid acts. Inmates should be strip searched and no cups or containers given period. If inmate is convicted of throwing feces or any bodily fluids he should be given an extra 2 yrs flat time to be served consecutively with any other sentence and that time should be done after you have completed the sentence of their original instant charge, and it should never be made to run concurrently with any time. Posted policy should be put up 30 days prior to implementation of that sanction, or rule.[11]

Regarding plaintiffs' suggestions, the Court notes that not all of their proposed solutions are within the power of the named defendants to implement. Further, even with respect to those that are within the defendants' sphere of authority, it would not be appropriate for the Court to dictate that they adopt particular solutions to this problem. Indeed, the United States Supreme Court has noted that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). See also Meachum v. Fano, 427 U.S. 215, 229 (1976) ("The federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States."); Gates v. Cook, 376 F.3d 323, 338 (5th Cir. 2004) (noting that federal courts "are not to micromanage state prisons").

The Court's role, therefore, is limited to determining whether an inmate's rights have been violated and, if so, provide relief. In this case, because the plaintiffs' underlying contention appears to be they should be protected from being attacked with urine and feces, the Court assumes that they are asserting a "failure to protect" claim. Undoubtedly, the Constitution requires that inmates be

---

[11]   Rec. Doc. 3-1, p. 8.

provided "with basic human needs, including ... protection from harm, during their confinement."

Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).  However, the United States

Fifth Circuit Court of Appeals has explained:

> To establish a failure-to-protect claim under § 1983, [an inmate] must show that he
> was incarcerated under conditions posing a substantial risk of serious harm and that
> prison officials were deliberately indifferent to his need for protection.  In order to
> act with deliberate indifference, the official must both be aware of facts from which
> the inference could be drawn that a substantial risk of serious harm exists, and he
> must also draw the inference.

Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) (citations and internal quotation marks omitted).

"*Actual* knowledge and appreciation of the risk are required."  Smith v. Jaramillo, 394 Fed. App'x

183, 185 (5th Cir. 2010) (emphasis in original).

Here, however, plaintiffs' allegations fall short of what is required to state a "failure to

protect" claim.  For example, there is no allegation that urine and/or feces have ever been thrown

on them, and any suggestion that they are in danger of such an attack in the future is entirely

speculative.  Further, in any event, the complaint's factual allegations are insufficient to state a

plausible claim that any of *named* defendants are personally aware of and have been deliberately

indifferent to plaintiffs' need for protection against such an attack.  This claim should therefore be

dismissed.

## IV.  Price-Gouging

Plaintiffs also complain that the jail commissary engages in price-gouging, charging double

or triple of the fair market value for items.  However, that claim must be dismissed because an

inmate has no constitutional right to reasonable commissary prices.  See, e.g., Jones v. Barthelemy,

No. 94-30157, 1996 WL 460003, at*2 (5th Cir. June 30, 1996) (affirming dismissal of detainee's

claim challenging high commissary prices, noting "a condition is not tantamount to punishment merely because it interferes with a detainee's desire to live more comfortably"); <u>French v. Butterworth</u>, 614 F.2d 23, 25 (1st Cir. 1980) (holding "there is simply no legal basis for a demand that inmates be offered items for purchase at or near cost"); <u>DeClouette v. Louisiana</u>, Civ. Action No. 11-CV-1211, 2013 WL 5516459, at *2 (W.D. La. Oct. 2, 2013) ("The law is clear that inmates have no constitutionally protected interest in purchasing goods through the prison commissary at the cheapest price possible."); <u>Boyd v. Lasher</u>, Civ. Action No. 09-7641, 2010 WL 444778, at *2 (E.D. La. Feb. 8, 2010) ("Numerous courts that have considered claims like Boyd's that prices of prison commissary items are too high have held that such allegations fail to state a claim of violation of constitutional rights cognizable under Section 1983.").

V.  "Code 6" Classification

Plaintiffs next complain that "Code 6" inmates are less likely to be chosen when inmates are selected for release due to prison overcrowding.[12]  They further complain that no one will explain what qualifies an inmate for a "Code 6" classification.

To dispel any mystery concerning that designation, the Court notes that a "Code 6" inmate is one identified as a career criminal.  <u>See, e.g.</u>, <u>Jones v. Sassone</u>, 205 F. Supp. 2d 602, 603-04 (E.D. La. May 30, 2002); <u>State v. Lagarde</u>, 960 So.2d 1105, 1116 n.24 (La. App. 5th Cir. 2007).  In <u>Jones</u>, United State District Judge Mary Ann Vial Lemmon noted that the Jefferson Parish Sheriff's Office and District Attorney's Office employ the designation and classification system, explaining:

---

[12]    Plaintiffs also allege that "Code 6" inmates receive harsher sentences in the Jefferson Parish courts.  However, none of the named defendants are responsible for sentencing inmates.  Therefore, this opinion need not address that allegation.

10

The Jefferson Parish Sheriff's Office established the "Code 6" Career Criminal Intercept Unit and the Vertical Prosecution Program to reduce crime by prosecuting the criminals who are responsible for a majority of the crime.  The program is based on studies and experience which indicate that the recidivist is a small but chronic percentage of the criminal population who is responsible for a large and disproportionate share of crime.

    The Code 6 program is composed of three components which are designed to insure that

> (1) the participants are objectively identified through a 20 point rating system which takes into account felony arrests, convictions and evaluates the total criminal history accumulated including pending charges.  Heavy emphasis is placed on crimes of violence, drugs, and weapons and attention is also given to an individual who has obtained five or more felony arrests in three different crime categories or an individual who has obtained a felony arrest within thirty months of the current charge.

> (2) individuals are selectively incapacitated from society by the Code 6 participants appealing to magistrates to enhance bonds based on either the severity of the charge or the criminal history of the offender as reflected by the point total criteria;

> (3) individuals who are identified are then vertically prosecuted by the Code 6 special prosecutor who uses the State's Habitual Offender Law to enhance sentences through multiple billing.  Once assigned to the Vertical Prosecution program, the individual is administratively classified as a "Red File" connoting a high rating with one or more prior felony convictions.  All other accepted defendants are classified as a "Blue File" and are noted as target offenders that rate high on the criteria.  Blue file individuals are prosecuted by the regular division district attorneys with special supervisory instructions regarding pleas or disposition of sentencing.

Jones, 205 F. Supp. 2d at 603-04.

    Even if the Court assumes for the purposes of this decision that plaintiffs are "Code 6"

inmates and have been discriminated against (or are in danger of being discriminated against) on that

basis with respect to consideration for release due to overcrowding, this claim still fails for the following reasons.

Essentially, plaintiffs are attempting to assert an equal protection claim. Simply put, "[t]he Equal Protection Clause directs that persons similarly situated should be treated alike. To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999) (citation and quotation marks omitted).

As an initial matter, the Court notes that plaintiffs complain that "Code 6" inmates are treated differently in the selection process than inmates who do not have the "Code 6" designation. However, that is not the relevant comparison for an equal protection analysis, because "Code 6" inmates simply are not "similarly situated" to inmates who are not career criminals. See, e.g., White v. Lockhart, No. 91-3194, 1992 WL 95375 (8th Cir. May 7, 1992) ("To establish an equal protection claim, White must show at a minimum that he received different treatment than other similarly-situated inmates. White has not stated an equal protection claim because he has not alleged that he is similarly situated to those inmates who could be considered for early release under the provisions of the Act." (citation omitted)).

Further, "Code 6" inmates are not a protected class. See, e.g., Thigpen v. City of San Mateo, No. C 04-0264, 2005 WL 1875802, at *8 (N.D. Cal. Aug. 8, 2005) ("'[S]uspected career criminals' is not a recognizable protected class."). Therefore, the challenged policy need only be rationally related to the achievement of a legitimate state interest in order to survive an equal protection challenge. See, e.g., Torres v. Chapman, 359 Fed. App'x 459, 462 (5th Cir. 2009).

The policy in question here easily survives a "rational basis" analysis. Because career criminals present a greater threat to society if released, a policy which excludes them from consideration for release due to overcrowding is eminently rational.  Cf. Keeton v. Oklahoma, 32 F.3d 451 (10th Cir. 1994) (rejecting an equal protection claim to a statute which allowed only certain groups of prisoners to receive early release based on prison overcrowding, noting that "the state has a legitimate interest in designating that only prisoners who have been convicted of lesser crimes or who are subject to no higher than medium security may be released so as to avoid a greater threat to society at large" and that the statute was rationally related to the achievement of that interest).

For all of these reasons, this claim should be rejected.

### VI.  Inconsistent Practices for Food and Medication Distribution

Plaintiffs next complain that different officers follow different practices during food and medication distribution at the J.P.C.C..  For example, during meal distribution, some officers tell inmates to stay by their bunks, while others allow inmates to receive their meal at the service slot. Similarly, some officers require that inmates get off of the telephone to receive medication, while others do not.

These allegations do not warrant relief or federal intervention.  Obviously, there is no constitutional requirement that meals or medications be distributed in a particular manner or that all prison guards perform their duties in the same way.  Further, the federal courts simply have no role to play with respect to such minutia of jail administration.  See also Gates v. Cook, 376 F.3d 323, 338 (5th Cir. 2004) (noting that federal courts "are not to micromanage state prisons").  Therefore, this claim should be dismissed.

### VII.  Food Service

Plaintiffs also complain about the food service at the jail, stating:

> JPCC is still feeding inmates off of moldy food trays that the plastic coating is peeling off, which makes the trays porous and susceptible to harmful bacteria.  In fact the kinds of bacteria that cause food poisoning don't always change the look, smell or even the taste of the food.  Our food is served below 140° and is served upon open carts and not inside of a heated food cart. ...  And we are served old meats which are freezer burnt and outdated yet they still serve it to inmates on these old moldy trays.[13]

Because inmates are restricted in their ability to fend for themselves, the state owes them a a duty "that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of 'basic human needs.'" Hare v. City of Corinth, Mississippi, 74 F.3d 633, 639 (5th Cir. 1996).  Jails must therefore provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980).

That said, it is also clear that "[i]nmates cannot expect the amenities, conveniences and services of a good hotel." Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988).  Further, although plaintiffs speculate that the manner in which the food is served at the jail could cause serious harm, they do not allege that they (or, for that matter, other inmates) have actually ever been harmed by the food service.  "[W]ithout an allegation of resulting harm, complaints regarding food service practices simply are not of constitutional dimension." Gabriel v. Gusman, Civ. Action No. 10-1688, 2010 WL 3169840, at *6 (E.D. La.  July 16, 2010), adopted, 2010 WL 3175045 (E.D. La. Aug. 10, 2010); accord Hawkins v. Gusman, Civ. Action No. 10-1178, 2011 WL 1527218, at *4 (E.D. La.

---

[13]    Rec. Doc. 3-1, pp. 10-11.

Apr. 1, 2011), adopted, 2011 WL 1527021 (E.D. La. Apr. 20, 2011); Spurlock v. Gusman, Civ. Action No. 10-991, 2010 WL 2102829, *7 (E.D. La. May 5, 2010), adopted, 2010 WL 2102825 (E.D. La. May 25, 2010).  Further, plaintiffs' complaints about the condition of the food trays and the food temperature are, without more, insufficient to state a cognizable claim.   See, e.g., Wilkerson v. Champagne, No. 03-1754, 2003 WL 22872106, at *2 (E.D. La. Nov. 28, 2003) (no constitutional claim when meals served from "old, cracked, dirty food trays" were not always hot); Sardon v. Peters, No. 94 C 7505, 1995 WL 609147, at *8 (N.D. Ill. Oct. 13, 1995) (allegation that cold food was served fails to state a constitutional claim); Jackson v. Griffith, No. 1:93-CV-424, 1995 WL 21939, at *4-5 (E.D. Tex. Jan. 10, 1995) (claim regarding unsanitary food trays resulting from overcrowded conditions dismissed as frivolous), adopted, 1995 WL 313655 (E.D. Tex. Feb. 8, 1995).

Lastly, although plaintiffs complain about the quality of the meat served, the constitutionality of prison food is not judged by its gastronomic appeal. See, e.g., Cummings v. Gusman, Civ. Action No. 09-144, 2009 WL 1649737, at *3 n.11 (E.D. La. June 9, 2009).  Rather, the Constitution requires only that jail meals prove "reasonably adequate food" with "sufficient nutritional value to preserve health." Eason v. Thaler, 73 F.3d 1322, 1327 (5th Cir. 1996) ("To comply with the Constitution, inmates must receive 'reasonably adequate' food."); Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977) ("A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required.").  Nothing in plaintiffs' complaint suggests that the meals fail to meet that minimal standard.

For all of these reasons, this claim should be dismissed.

15

## VIII.  Attendance at Funeral Services

Plaintiffs next complain that inmates are not allowed to attend funeral services for family members.  Even if that allegation is true, it does not state a claim actionable pursuant to 42 U.S.C. § 1983.  It is beyond cavil that a prisoner has no federal statutory or constitutional right to attend a relative's funeral.  Rathers v. Raney, No. 99-6627, 2000 WL 1871702, at *2 (6th Cir. 2000); Carlisle v. Rayburn Correctional Center, Civ. Action No. 07-451, 2007 WL 550054, at *2 (E.D. La. Feb. 16, 2007); Smith v. Tanner, Civ. Action No. 06-1413, 2006 WL 2850182, at *2 (E.D. La. Oct. 3, 2006); Adams v. Garland County Detention Center, No. 05-6086, 2006 WL 1361121, at *2 (W.D. Ark. May 17, 2006); Renfrow v. Morris, No. Civ. A. 3:01CV09, 2001 WL 34564383, at *2 (E.D. Va. Aug. 15, 2001), aff'd, 26 Fed. App'x 286 (4th Cir. 2002); Mercer v. Green Haven Correctional Facility, No. 94 CIV. 6238, 1998 WL 85734, at *3 (S.D.N.Y. Feb. 27, 1998); Allen v. Senkowski, No. CIVA95CV1499, 1997 WL 570691, at *1 (N.D.N.Y. Sept. 11, 1997); Green v. Coughlin, No. 94 Civ. 3356, 1995 WL 498808, at *1 (S.D.N.Y. Aug. 22, 1995); Hipes v. Braxton, 878 F. Supp. 56, 57 (W.D. Va. 1995); Brooks v. Nash, No. 92C243, 1993 WL 266526, at *3 (N.D. Ill. July 15, 1993); Colon v. Sullivan, 681 F. Supp. 222, 223 (S.D.N.Y. 1988).  Therefore, this claim should likewise be dismissed.

## IX.  Library

Plaintiffs also claim that the jail library is "pathetic" and a "major hindrance to the inmate population."  They further argue that it is a "conflict of interest" to have an employee of the Sheriff's Office assisting inmates with their cases.  Lastly, they opine that because the books in the library are inadequate, inmates must resort to computerized research for which they are charged a fee.  Like

plaintiffs' claim challenging the jail's policy for indigent legal mail, this claim challenging the adequacy of the jail's law library and legal services is an "access to courts" claim.

As already noted, it is clear that prisoners have a constitutional right of meaningful access to the courts. This right includes access to adequate law libraries or assistance from legally trained personnel needed to file nonfrivolous legal claims challenging their convictions or conditions of confinement. Bounds v. Smith, 430 U.S. 817, 828 (1977); Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999). However, the Supreme Court in Bounds "did not create an abstract, freestanding right to a law library or legal assistance" in the prison. See Lewis v. Casey, 518 U.S. 343, 351 (1996). Moreover, as already explained earlier in this opinion, claims alleging violations of the right of access to courts are not cognizable unless the inmate's position as a litigant was actually prejudiced by the denial of access. See, e.g., Chriceol v. Phillips, 169 F.3d 313, 317 (5th Cir. 1999); Ruiz v. United States, 160 F.3d 273, 275 (5th Cir. 1998); McDonald v. Steward, 132 F.3d 225, 230-31 (5th Cir. 1998); Walker v. Navarro County Jail, 4 F.3d 410, 413 (5th Cir. 1993).

In the instant case, plaintiffs do not allege that they have suffered any prejudice whatsoever from the purportedly inadequate law library and legal services, and it is clear "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Lewis, 518 U.S. at 351. Plaintiffs "ha[ve] not alleged that [they were] actually denied access to the court or that any pending litigation was prejudiced, and therefore [they have] not stated a cognizable § 1983 claim." Clark v. Foti, No. 94-30615, 1995 WL 136127, at *2 (5th Cir. Mar. 8, 1995). Accordingly, this claim should be dismissed.

17

<u>X.  Grooming Policy</u>

Plaintiffs also complain that pretrial detainees are forced to cut their hair and, if they refuse, they have their privileges curtailed or they are placed in lockdown.  Plaintiffs opine that pretrial detainees should not be required to cut their hair because they have not yet been convicted of a crime.

As an initial matter, it is unclear whether plaintiffs had this happened to them.  Obviously, if they did not, they have no standing to assert this claim.  Nevertheless, even if the Court assumes that plaintiffs were required to cut their hair as pretrial detainees, their rights were not violated for the following reasons.

Obviously, it is beyond dispute that, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.  A person lawfully committed to pretrial detention has not been adjudged guilty of any crime." <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-36 (1979) (footnote and citations omitted).  However, that general proposition does not resolve plaintiffs' claim.  Despite the fact that a pretrial detainee may not be punished for his criminal offense, he may still be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." <u>Id</u>. at 536-37.  Therefore, whether a particular restriction or condition of pretrial confinement is impermissible turns on "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." <u>Id</u>. at 538.  The Supreme Court explained:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.  Thus, if a

particular condition or restriction of pretrial detention is reasonably related to a
legitimate governmental objective, it does not, without more, amount to
"punishment."  Conversely, if a restriction or condition is not reasonably related to
a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that
the purpose of the governmental action is punishment that may not constitutionally
be inflicted upon detainees *qua* detainees.  Courts must be mindful that these
inquiries spring from constitutional requirements and that judicial answers to them
must reflect that fact rather than a court's idea of how best to operate a detention
facility.

Id. at 538-39 (citations, footnotes, quotation marks, and brackets omitted).  Moreover, the Supreme

Court made clear that the restrictions and conditions imposed may extend beyond those which are

necessary simply to ensure a detainee's presence for trial, explaining:

If the government could confine or otherwise infringe the liberty of detainees only
to the extent necessary to ensure their presence at trial, house arrest would in the end
be the only constitutionally justified form of detention.  The Government also has
legitimate interests that stem from its need to manage the facility in which the
individual is detained.   These legitimate operational concerns may require
administrative measures that go beyond those that are, strictly speaking, necessary
to ensure that the detainee shows up at trial.  For example, the Government must be
able to take steps to maintain security and order at the institution and make certain
no weapons or illicit drugs reach detainees.  Restraints that are reasonably related to
the institution's interest in maintaining jail security do not, without more, constitute
unconstitutional punishment, even if they are discomforting and are restrictions that
the detainee would not have experienced had he been released while awaiting trial.
We need not here attempt to detail the precise extent of the legitimate governmental
interests that may justify conditions or restrictions of pretrial detention.  It is enough
simply to recognize that in addition to ensuring the detainees' presence at trial, the
effective management of the detention facility once the individual is confined is a
valid objective that may justify imposition of conditions and restrictions of pretrial
detention and dispel any inference that such restrictions are intended as punishment.

Id. at 540 (citation, footnote, and quotation marks omitted).

A requirement that inmates cut their hair generally is not imposed as a form of punishment;

rather, it is imposed because long hair in a jail setting presents hygiene problems and security

concerns (such as concealment of contraband and the ability to change one's appearance to disguise

identity).  Those obviously legitimate governmental interests exist regardless of whether the inmate is a convicted prisoner or a pretrial detainee.  Accordingly, prison officials normally may require haircuts,[14] and, if an inmates refuses, impose sanctions for noncompliance.  <u>Johnson v. Bolivar County</u>, No. 2:08CV226, 2009 WL 4855988, at *4 (N.D. Miss. Dec. 9, 2009).  Further, any such disciplinary measures resulting from a failure to abide by the jail's rules concerning haircuts is not impermissible *"punishment" for the underlying criminal offense*; rather, it is a permissible *sanction for violating the jail's rules*.  Even pretrial detainees are not "free to violate jail rules with impunity.  Indeed, <u>Bell</u> recognizes the need for preserving 'internal order and discipline' among pretrial detainees as well as convicted prisoners."  <u>Mitchell v. Dupnik</u>, 75 F.3d 517, 524 (9th Cir. 1996).

For all of these reasons, this claim should be dismissed.

### XI.  Prohibition Against Inmate-to-Inmate Correspondence

Plaintiffs next challenge the jail's policy prohibiting inmates from corresponding with inmates in other facilities.  However, this claim clearly must be dismissed, because the United States Supreme Court has expressly held that such policies are constitutional.  <u>Turner v. Safley</u>, 482 U.S. 78, 93 (1987).

### XII.  Lack of Programs

Plaintiffs also complain that the J.P.C.C. has no rehabilitation programs, such as a program which allows an inmate to earn a General Education Diploma (G.E.D.).  This claim should be

---

[14]   The Court is aware that grooming restrictions are invalid if they run afoul of Religious Land Use and Institutionalized Persons Act of 2000.  <u>See, e.g.</u>, <u>Holt v. Hobbs</u>, 135 S. Ct. 853 (2015).  However, plaintiffs do not challenge the grooming policy at J.P.C.C. on religious grounds, and so that narrow exception need not be addressed in this opinion.

dismissed as frivolous because there is no constitutional right to such services or programs in jail. Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988) ("[H]owever worthwhile and prudent such a program might be, ... a state has no constitutional obligation to provide basic educational or vocational training to prisoners."); Oatis v. St. Tammany Parish Sheriff's Office, Civ. Action No. 09-6266, 2009 WL 3566120, at *2-3 (E.D. La. Oct. 29, 2009) ("Prisoners have no constitutional right to participate in educational, work release or other rehabilitation programs, particularly when no such programs exist at the facility."); Oglesby v. Gusman, Civ. Action No. 09-3593, 2009 WL 3254145, at *2 (E.D. La. Oct. 7, 2009); Sampson v. Corrections Corporation of America, No. 08-CV-0915, 2009 WL 837640, at *16 (W.D. La. Mar. 26, 2009) ("Prisoners do not have a constitutional right to 'social services.'  Nor do inmates have a protected liberty interest in specific educational programs, recreation opportunities, or in avoidance of being transferred to facilities where the programs are less comprehensive. The United States Constitution does not mandate educational, rehabilitative, or vocational programs." (citation omitted)); Wilbon v. Gusman, Civ. Action No. 05-2443, 2006 WL 2119458, at *2 (E.D. La. July 25, 2006).

## XIII.  Disciplinary Procedures

Lastly, plaintiffs complain:

> The disciplinary board hearing officers here at JPCC are out of order and do not comply to any of the disciplinary hearing procedures written in the "JPCC Inmate Rules, Regulations and Procedures."  During DB hearings, inmates motions are not accepted, inmates are not allowed to call witnesses in their behalf, the disciplinary hearing is not recorded on audio recording device or tape recorder.  Also, when an inmate appeals his sentence of lockdown time, he is still locked up instead of deferring his lockdown time until the appeal is disposed of, which is a strict violation of inmates due process.[15]

---

[15]   Rec. Doc. 3-1, pp. 14-15.

As a initial matter, the Court notes that plaintiffs have failed to name a proper defendant with respect to this claim. Although they list "All S.I.U. Disciplinary Hearing Officers" as a defendant,[16] that is improper. A § 1983 claim may only be asserted against actual identified persons. Francis v. Terrebonne Parish Sheriff's Office, Civ. Action No. 08-4972, 2009 WL 4730707, at *3 (E.D. La. Dec. 9, 2009); Staritz v. Valdez, No. 3-06-CV-1926, 2007 WL 1498285, at *2 (N.D. Tex. May 21, 2007); Banks v. United States, Civ. Action No. 05-6853, 2007 WL 1030326, at *11 (E.D. La. Mar. 28, 2007); Vollmer v. Bowles, Civ. Action No. 3:96-CV-0081, 1997 WL 102476, at *2 (N.D. Tex. Feb. 28, 1997).

Nevertheless, even if plaintiffs had named a proper defendant, their allegations are insufficient to state a cognizable, nonfrivolous claim. For example, once again, there is no indication that plaintiffs themselves have ever been the subject of prison disciplinary proceedings, and, as already noted, they do not have standing to assert claims on behalf of their fellow inmates. Further, in any event, prisoners have only limited due process rights with respect to disciplinary actions. Specifically, in Sandin v. Conner, 515 U.S. 472 (1995), the United States Supreme Court held:

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 483-84 (citations omitted).

---

[16]   Rec. Doc. 3-1, p. 5.

In light of Sandin, the United States Fifth Circuit Court of Appeals then held that "it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the *duration* of confinement, will henceforth qualify for constitutional 'liberty' status" entitled to procedural due process protections. Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir. 1995) (emphasis added). Stated differently, the Fifth Circuit has observed that the liberty interests protected by the Due Process Clause are "generally limited to state created regulations or statutes which affect the *quantity of time* rather than the *quality of time* served by a prisoner." Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997) (emphasis added).

The only sanction plaintiffs mention in the complaint is placement in lockdown; however, it is clear that prisoners generally need not be afforded due process with respect to reassignment to such a placement. For example, in Hernandez v. Velasquez, 522 F.3d 556 (5th Cir. 2008), the Fifth Circuit rejected the claim of a prisoner who had been placed in lockdown without any hearing whatsoever, explaining:

> Hernandez also claims his lockdown without a hearing violated his rights to due process. To maintain this due process challenge, Hernandez must establish that his transfer to lockdown deprived him of a liberty interest protected by the Fourteenth Amendment. Meachum v. Fano, 427 U.S. 215, 223, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). But generally speaking, a prisoner has no liberty interest in his custodial classification. This court has repeatedly affirmed that "[p]rison officials should be accorded the widest possible deference" in classifying prisoners' custodial status as necessary "to maintain security and preserve internal order." McCord v. Maggio, 910 F.2d 1248, 1251 (5th Cir. 1990); Wilkerson v. Stalder, 329 F.3d 431, 436 (5th Cir. 2003). And in the specific context of administrative lockdown, we have clearly held that "absent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim." E.g., Pichardo v. Kinker, 73 F.3d 612, 612-13 (5th Cir. 1996) (affirming dismissal of claim that lockdown for suspected gang affiliation violated due process).

Hernandez, 522 F.3d at 562 (footnotes omitted).   Therefore, even if plaintiffs have been placed in prison disciplinary proceedings, and even if those proceedings failed to provide them with due process, they have no plausible claim unless the resulting punishment imposed an atypical and significant hardship on them in relation to the ordinary incidents of prison life.  They make no such allegation in this lawsuit, and this claim should therefore be dismissed.

## RECOMMENDATION

It is therefore **RECOMMENDED** that plaintiffs' complaint be **DISMISSED WITH PREJUDICE** as frivolous and/or for failing to state a claim on which relief may be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[17]

New Orleans, Louisiana, this ninth day of February, 2015.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[17]   Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.